## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES G. HUNDLEY : | |
| 62 Forge Drive : | |
| Mickleton, New Jersey 08056 : | |
| : | |
| vs. : | Civil Action No. |
| : | |
| ORBIT ENERGY AND POWER, LLC : | **COMPLAINT** |
| 570 Mantua Blvd., Suite 1 : | **JURY TRIAL DEMANDED** |
| Sewell, New Jersey 08080 : | |
| : | |
| and : | |
| : | |
| SEAN ANGELINI (individually) : | |
| *Via his place of employment* : | |
| 570 Mantua Blvd., Suite 1 : | |
| Sewell, New Jersey 08080 : | |

AND NOW, Plaintiff, James G. Hundley brings this action for relief from discrimination, disparate treatment, hostile work environment, and retaliation suffered while employed by Defendants Orbit Energy and Power, LLC and Sean Angelini on the basis of Plaintiff's race and color. Plaintiff brings these claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 ("§ 1981"), and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A 10:5-1 *et. seq.* Plaintiff alleges and avers the following in support thereof:

### PARTIES

1. Plaintiff, James G. Hundley (hereinafter referred to as "HUNDLEY" or "Plaintiff"), is an adult male individual who resides at 62 Forge Drive, Mickleton, New Jersey 08056.

2. Defendant, Orbit Energy and Power, LLC (hereinafter referred to as "ORBIT"), is an entity and/or corporation duly existing under the laws of the State of New Jersey and conducting business affecting interstate commerce. Defendant ORBIT has a registered office at 570 Mantua Boulevard, Suite 1, Sewell, New Jersey 08080.

3. At all times material, Defendant ORBIT employed Plaintiff by directing and maintaining control over Plaintiff by and through ORBIT employees and supervisors including, but not limited to, Sean Angelini. Defendant ORBIT's employee, Sean Angelini, made material decisions pertaining to Plaintiff's employment.

4. Upon information and belief, Defendant, Sean Angelini (hereinafter referred to as "ANGELINI") is an adult male individual who, at all times material, was the owner and operator of Defendant ORBIT and made material decisions pertaining to Plaintiff's employment. Defendant ANGELINI is alleged and believed to live, reside, and work in New Jersey.

5. At all times material, Defendant ORBIT agreed, accepted, adopted, acquiesced, and/or otherwise is/was bound by the actions, omissions, and/or conduct of its officers, managers, supervisors, employees, and agents including, but not limited to, Defendant ANGELINI.

6. Defendant ORBIT and Defendant ANGELINI are hereinafter referred to jointly and/or individually as "Defendants."

## **JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over Plaintiff's claims arising under Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and 42 U.S.C § 1981, pursuant to 28 U.S.C. §1331, and 29 U.S.C. § 216(b). The Court has supplemental jurisdiction of the state law causes of action under New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A 10:5-1 *et. seq.*

8. Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.  On April 21, 2022, Plaintiff filed a Charge of Discrimination (Charge No. 530-2022-04318) with the Equal Employment Opportunity Commission ("EEOC").

10. On September 08, 2022, Defendants submitted a Position Statement in response to Plaintiff's Charge of Discrimination.

11. Plaintiff received a Notice of Right to sure from the EEOC on October 11, 2022.

12. Plaintiff has completed all pre-requisites to bring his claims of discrimination against Defendant ORBIT as he filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and Plaintiff received a Notice of Right to Sue after which he timely filed this Complaint.

## MATERIAL FACTS

13. On or around October 26, 2020, Plaintiff was hired by Defendant ORBIT as the Call Center Director.

14. At all times material, Plaintiff directed daily operations of the Call Center and oversaw Team Members in scheduling appointments with potential clients.

15. Prior to accepting the offer of employment, Plaintiff was informed that he would receive a commission based upon the number of "sits" he obtained for clients. Plaintiff was told that the exact percentage of the commission would be determined once the office hired enough agents to handle the workload.

16. At all times material, a "sit" was defined as an appointment scheduled by a member of Plaintiff's team that went forward to possibly result in a sale.

17. During the period of October 2020 – February 2021, Plaintiff 's team exceeded all previous appointment setting records in the company.

18. In or around December 2020, Supervisor Frank Washart informed Plaintiff hiring for the Sewell, New Jersey call center was suspended.

19. The decision to suspend hiring had a direct adverse effect on Plaintiff 's ability to secure "sits" for clients, thereby depriving Plaintiff of income he would have otherwise been able to obtain.

20. Supervisor Washart informed Plaintiff that the decision to suspend hiring was based upon conversations with Lisa Angelini (Caucasian Woman), Defendant ANGELINI's sister who expressed concern regarding the efficacy and success of the Call Center.

21. At all times material, Lisa Angelini was a subordinate of Plaintiff. However, Lisa was never informed of this hierarchy and would make regular reports to Defendant ANGLINI regarding Plaintiff's work performance.

22. At all times material, Defendant had access to Call Center statistics indicating both the efficacy and success rate of the Call Center.

23. Defendant instead relied on a baseless, unverified report made by Plaintiff 's subordinate in making the decision to limit Plaintiff 's income.

24. Upon learning of the basis for Defendant's decision, Plaintiff questioned Supervisor Washart regarding the decision as Plaintiff was not consulted regarding whether the suspension was necessary, despite his title as Director of the Call Center.

25. Supervisor Washart apologized to Plaintiff stating that they were permitted to continue hiring but provided no explanation as to why the decision was made in the first place.

26. Plaintiff further questioned Supervisor Washart regarding inequality in commission distribution among Call Center employees.

27. In or around January 2021, Plaintiff explained that Lisa Angelini (Caucasian) received $15.00 per sit whereas Plaintiff and coworker, Jamond Lawrence (both African American) only received $12.00 and $5.00 per sit, respectively.

28. Supervisor Frank Washart responded by explaining that the company is not racist and loves everyone but provided no explanation for the disparity in compensation.

29. Frank Washart continued by informing Plaintiff that decisions regarding compensation and commissions were left to the discretion Defendant ANGELINI.

30. Plaintiff told Supervisor Washart that he was simply interested in being compensated on a non-discriminatory basis.

31. At all times material, Jamond Lawrence and Plaintiff were the only African American managers employed by Defendant ORBIT

32. At all times material, the decision to pay Plaintiff less than his white counterparts was a result of the discriminatory animus towards African Americans held by Defendants.

33. Later that same evening, Defendant ANGELINI arrived at the Call Center to discuss Plaintiff's compensation.

34. During their conversation, Defendant ANGELINI threatened Plaintiff stating, "Be careful not to price yourself out of your position."

35. Plaintiff questioned Defendant ANGELINI regarding the meaning of the statement and indicated that the disparity in pay was illustrative of a discriminatory animus against African Americans.

36. Defendant ANGELINI'S warning was meant to deter or otherwise prevent Plaintiff from seeking compensation equal to that of his white counterparts.

37. In or around April 2021, Plaintiff received an offer for a position at another company and put in his two-week notice of resignation.

38. Plaintiff was convinced to remain with Defendant by Supervisor Washart on the promise that Plaintiff would receive an increase in salary and commission, along with health insurance benefits.

39. Plaintiff never received the agreed upon increase in salary, commission, or health insurance benefits.

40. Plaintiff repeatedly questioned Frank Washart on multiple occasions regarding the increase in compensation and the repair of the HVAC system.

41. Supervisor Washart repeatedly evaded Plaintiff 's questions, stating that a conversation with Defendant ANGELINI would be necessary first.

42. Supervisor Washart informed Plaintiff that the decision to increase his compensation would be reviewed in October 2021.

43. Defendant never reviewed the decision to increase Plaintiff s compensation as originally promised by Supervisor Washart.

44. Plaintiff never received the agreed upon increase in compensation and is unaware of any conversations between Supervisor Washart and Defendant ANGELINI regarding the same.

45. On or around July 23, 2021, Defendant ANGELINI arrived at the Call Center and asked to speak with Plaintiff upstairs privately.

46. Instead of speaking upstairs in the conference room Defendant ANGELINI proceeded outside to tables near the call center, thereby isolating Plaintiff from his subordinates and coworkers.

47. Once alone, Defendant ANGELINI began yelling at Plaintiff, stating, "I just fired Frank! I want to know right fucking now, are you in or out?"

48. Plaintiff did not understand the question and asked Defendant ANGELINI to clarify the meaning of his question.

49. Defendant ANGELINI further raised his voice and repeated, "Are you in or fucking out?"

50. Plaintiff asked Defendant ANGELINI to calm down and lower his voice as he refused to be spoken to in such a manner.

51.  When Plaintiff received no response, he once again asked Defendant ANGELINI to clarify his questions.

52. Defendant ANGELINI informed Plaintiff that he terminated Frank Washart and another supervisor (Chris) because they had started another business without Defendant ANGELINI's knowledge.

53. Defendant ANGELINI also informed Plaintiff that one of the supervisors (Chris) accused Plaintiff of assisting Frank Washart in starting the secondary business.

54. Plaintiff explained that the accusation was impossible because Plaintiff rarely interacted with either of accused supervisors outside of work. Moreover, Plaintiff explained that he had very little interaction with Chris even during work hours.

55. Plaintiff further explained that he had little reason to assist Frank Washart as he felt the application of his raise had been mishandled in that Plaintiff never received the compensation promised by Supervisor Washart.

56. Defendant ANGELINI told Plaintiff that he was unaware of any issue with his raise and that he would resolve the issue immediately.

57. Plaintiff further explained to Defendant ANGELINI that Scooter (Caucasian Male) was working on a project for Frank with a website and that he should verify his allegations with Scooter himself.

58. Both Plaintiff and Defendant ANGELINI entered the call center and proceeded to the office that Plaintiff shared with Scooter.

59. Defendant ANGELINI asked Scooter if he was assisting Frank without raising his voice or using expletives.

60. Scooter showed Defendant ANGELINI the website and explained that Supervisor Washart asked him to design the site on his behalf.

61. Defendant ANGELINI did not yell or threaten Scooter's employment as he had done with Plaintiff despite Scooter's admission to helping Supervisor Washart.

62. Plaintiff questioned Defendant ANGELINI as to why he wasn't angry with Scooter for assisting Frank Washart in starting his secondary business.

63. Defendant ANGELINI did not respond to the question and left the building.

64. The following week, Defendant ANGELINI moved Scooter's office from the call center to the main building, thereby limiting Plaintiff 's contact.

65. Plaintiff never received the agreed upon raise in compensation.

66. At the conclusion of the conversation and prior to his departure, Defendant ANGELINI threatened Plaintiff by stating, "I will take you at your word for now. If I find out that you are involved, I am going to fire you and take you to court with Frank and Chris."

67. Defendant ANGELINI'S demeaning treatment of Plaintiff was based upon his discriminatory animus towards African Americans as none of Plaintiff s white counterparts were spoken to or threatened in such a manner.

68. Defendant ANGELINI had no reasonable basis for his accusation against Plaintiff.

69. Defendant ANGELINI made no effort to verify the accusation made by Chris and instead assumed Plaintiff 's compliance and guilt based on his discriminatory animus towards African Americans.

70. On or around July 26, 2021, Plaintiff spoke with Priscilla Rivera (Human Resources Director) to report the accusations made by Defendant ANGELINI.

71. Rivera informed Plaintiff that Defendant ANGELINI had questioned many employees regarding the business practices of the two terminated supervisors. However, Defendant ANGELINI made no accusations against any other employees.

72. At all times material, Defendant ANGELINI'S continuous, baseless accusations against Plaintiff were made based upon a discriminatory animus towards African Americans.

73. For approximately 9 months (July-February), Defendant ANGELINI continued to tell employees that he believed that Plaintiff was stealing leads and appointments ("sits") to further assist the two terminated supervisors.

74. On or around August 27, 2021, Plaintiff had a meeting with Corey Sandone (VP of Sales for NJ, DE, and FL) and Pat Carr (Vice Presidents of Sales for PA, MD, and FL).

75. During this meeting Plaintiff questioned Corey and Pat, asking them what a "WIZARD" was.

76. Corey and Pat responded by questioning Plaintiff as to why he asked.

77. Plaintiff responded that he saw something posted in the group chat that referenced calling someone a "Wizard?"

78. Both replied while laughing, "It's an inside joke."

79. On multiple occasions during the month of August 2021, Plaintiff was approached by coworkers who were told by Defendant ANGELINI that Plaintiff was stealing. Around this

same time the call center was in need of office supplies (water, printer paper, staples, dry erase markers, etc.)

80. At all times material, Defendant ANGELINI's circulated rumors and baseless claims of theft against Plaintiff stemmed from a discriminatory animus towards African Americans.

81. In or around August 2021, Plaintiff received a call from Defendant ANGELINI's assistant and girlfriend, Nicole who informed Plaintiff that she had been instructed by Defendant ANGELINI to cease supply orders exclusively for Plaintiff 's office.

82. Defendant ANGELINI expected Plaintiff to provide office supplies for the entire office without the financial assistance from Defendant that was available to Plaintiff 's white coworkers.

83. Plaintiff was the only Director who was expected to provide supplies for their entire office.

84. Plaintiff 's white counterparts received financial assistance from Defendant in providing supplies for their respective offices.

85. Upon learning of this directive, Plaintiff made multiple attempts to contact Defendant ANGELINI by phone and received no reply.

86. Plaintiff contacted Priscilla Rivera and informed her of the conversation with Nicole.

87. Priscilla told Plaintiff that he would need to provide supplies without financial assistance from the company.

88. From August 2021 until his constructive termination, Plaintiff was forced to pay for all office supplies. Plaintiff would keep receipts and receive reimbursement for those same expenses.

89. At all times material, Plaintiff was the only Director who was forced to pay for office supplies from his own pocket.

90. On or around September 15, 2021, Plaintiff attended dinner with Defendant ANGELINI at Defendants request.

91. Plaintiff questioned Defendant ANGELINI as to why he was forced to provide his own office supplies. Defendant ANGELINI provided no response.

92. Plaintiff further questioned Defendant ANGELINI regarding his repeated accusations of theft against Plaintiff .

93. Defendant ANGELINI changed the subject and replied by asking, "Bud, do you take credit for canvassing and self-generated appointments?"

94. Plaintiff responded by stating that he was not in the habit of doing either. Plaintiff further explained that he could verify the information by reviewing Plaintiff 's reports.

95. Defendant ANGELINI requested that Plaintiff provide a daily report on the call center's performance

96. Plaintiff responded by informing Defendant ANGELINI that he could find all relevant information in reports generated by the company already (CRM).

97. Defendant ANGELINI stated that he was unaware of any such report or his ability to review the relevant information regarding the call center.

98. Defendant ANGELINI then continued the conversation by stating that he wanted Plaintiff to take on more responsibility and act "like a COO."

99.  Plaintiff agreed and stated that he was willing to help with anything Defendant required.

100. Defendant ANGELINI then asked Plaintiff to provide insight on areas of improvement for the Call Center team.

101. Plaintiff explained a few areas of improvement for the office.

102. At all times material, Defendant ANGELINI'S decision to force Plaintiff to provide office supplies and refusal to answer questions regarding the same were motivated by a discriminatory animus towards African Americans.

103. On or around October 20, 2021, Defendant again invited Plaintiff to dinner to discuss Plaintiff's role in the company.

104. Defendant ANGELINI questioned Plaintiff regarding interactions with the company's canvassing team along with the formation of a team to handle canceled appointments.

105. Plaintiff informed Defendant ANGELINI that the Call Center did not have the inventory to create a new team for the purpose of handling canceled appointments.

106. On or around October 25, 2021, Plaintiff was informed that Bob Winzinger was hired as a Training Manager for the Sales Department.

107. Plaintiff was not aware that the company was hiring for this position and was informed of the new hire by Priscilla Rivera.

108. Priscilla Rivera also informed Plaintiff that Bob Winzinger (Caucasian Male) was hired without her knowledge, despite her position as a Director for Human Resources.

109. Priscilla Rivera further informed Plaintiff that Bob Winzinger was hired to manage a team that would handle canceled appointments despite Plaintiff 's objections to the formation of such a team.

110. Upon information and belief, Bob Winzinger was offered a higher starting salary and commission than Plaintiff despite possessing fewer qualifications and less experience.

111. In or around November 2021, Defendant ANGELINI asked Plaintiff to lunch to discuss the method and reason for Bob Winzinger's hire.

112. Plaintiff expressed his aggravation with Defendant ANGELINI's underhanded methods in hiring Bob Winzinger.

113. Plaintiff questioned Defendant ANGELINI as to why he continuously labeled Plaintiff as a thief when speaking to other employees

114. Defendant ANGELINI denied Plaintiff 's accusations.

115. Plaintiff further questioned Defendant ANGELINI as to why his Call Center received higher degrees of scrutiny and criticism regarding "sits" as compared to other departments in the company

116. Plaintiff cited facts including:

   a. Defendant ANGELINI imposed strict production goals and disciplinary measures solely on Plaintiff 's department.

   b. Bob Winzinger was being given better leads resulting in lower performance for Plaintiff 's department.

   c. Other departments in the company fell well short of the goals imposed by Defendant ANGELINI on Plaintiff 's department with no consequences, criticism, or additional scrutiny.

117. Defendant ANGELINI denied knowledge of leads being given to Bob Winzinger and dismissed Plaintiff s other accusations by changing the topic of conversation.

118. At all times material, Defendant ANGELINI'S decision to hire Bob Winzinger without Plaintiff 's knowledge was made because of a general mistrust and discriminatory animus towards African Americans.

119. On or around January 21, 2022, Defendant ANGELINI appeared at Plaintiff s workstation and asked if anything was needed in the office.

120. Plaintiff responded by asking Defendant ANGELINI to hire an administrative assistant.

121. Defendant ANGELINI informed Plaintiff that they would hire someone and continued by asking Plaintiff to take a walk with him. Defendant ANGELINI went on to suggest that Plaintiff, along with the entire call center, would move to the main building.

122. During their conversation, Plaintiff once again expressed his frustration with Defendant ANGELINI's continuous insinuations and accusations of theft by Plaintiff.

123. Plaintiff stated that he "believed there was something more to it," and that the method by which Bob Winzinger was hired was underhanded, outside of the company's normal hiring practices, and indicative of a more invidious purpose than simply handling canceled appointments.

124. Defendant ANGELINI responded by stating, "I know bud, I have to stop listening to people."

125. Defendant ANGELINI continued, stating, "It's not because you are black. I have a lot of people that work for me who aren't white. I have Mexicans, Spanish, and Black people."

126. Plaintiff explained to Defendant ANGELINI that the method by which Bob Winzinger was hired indicated a discriminatory animus towards African Americans as none of the white Directors had received similar treatment.

127. Defendant ANGELINI replied, "let's just get past this."

128. Defendant ANGELINI provided no further explanation for the underhanded method used to hire Bob Winzinger.

129. On or around February 2, 2022, Defendant ANGELINI asked Plaintiff to lunch to discuss his performance review.

130. Upon arrival, Defendant ANGELINI once again questioned Plaintiff regarding low performance reports in his department. Defendant ANGELINI was particularly concerned with the number of appointments being set in Plaintiff 's department.

131. Plaintiff responded by agreeing to increase the number of appointments set. Plaintiff further explained that he was primarily concerned with the quality of the appointments to increase overall sales, thereby explaining the decrease in appointments.

132. Defendant ANGELINI continued the conversation by accusing Plaintiff of falsifying data.

133. Plaintiff denied Defendant ANGELINI's accusation and stated that such an accusation unfairly targeted Plaintiff 's department.

134. Plaintiff continued by pointing to lower performance number in various departments throughout the company, including the department led by Bob Winzinger.

135. Plaintiff questioned several actions by Defendant ANGELINI taken solely against Plaintiff and his department, including:

   a. Plaintiff was the only Call Center Director required to submit daily reports regarding the number of appointments set.

   b. Plaintiff 's department was repeatedly asked to work on nights and weekends when other departments did not work past 5pm and generally only worked one day on weekends.

136. Plaintiff once again stated that "there was something more" to the behavior and that he was being unfairly targeted by Defendant ANGELINI.

137. Defendant ANGELINI responded by stating, "No, it's not like that. Stop saying that bud! I like you just as much as I like everyone else."

138. At all times material, Defendant ANGELINI held Plaintiff to higher standard and subjected him to higher levels of scrutiny than his white counterparts because of a discriminatory animus towards African Americans.

139. On or around, February 16, 2022, Plaintiff was scheduled to attend a company-wide meeting via Zoom videoconferencing.

140. Upon joining the meeting, Plaintiff was informed that the meeting was solely for the purposes of auditing his department. Plaintiff was originally told that the meeting was for the purpose of improving the company as a whole.

141. At the end of the conference, Plaintiff was removed from the conference and was unable to rejoin. Plaintiff contacted the IT Department, hoping to resolve the issue.

142. The representative for the IT Department (Michael) was unsure as to why Plaintiff was experiencing technical difficulties. Michael explained that he would need to call Plaintiff back regarding a solution.

143. Approximately five minutes later, Plaintiff received a call from Michael informing him that the problem was resolved.

144. Plaintiff replied by inquiring about the technical issue he experienced. Plaintiff was unsure as to why he was removed from the meeting.

145. Michael replied, "I am sorry, but I was told not to tell you."

146. Plaintiff ended the call and immediately reported the conversation to Pricilla Rivera who was unaware of the situation.

147. At all times material, Plaintiff was purposefully excluded from the videoconference because of his race and color.

148. Defendant ANGELINI or one of his agents purposefully prevented Plaintiff from accessing the meeting because Plaintiff repeatedly expressed frustration with the discriminatory practices of Defendant.

149. On or around February 17, 2022, Plaintiff was informed by his subordinates (Brittany and Kaley) that agents in Bob Winzinger's department were stealing appointments.

150. Brittany and Kaley explained that the agents were canceling appointments on their books and re-entering the appointments for Bob Winzinger's department.

151. Plaintiff immediately called Bob Winzinger's supervisor, Corey Sandone and informed him of the situation.

152. Corey Sandone denied knowledge of the practice and stated that he would investigate the matter further.

153. On or around February 18, 2022, Plaintiff attended a teleconference during which Plaintiff further questioned Corey Sandone regarding the stolen appointments.

154. Corey replied, "I will find out and get back to you."

155. Plaintiff pleaded with Corey for assistance as Plaintiff s department was growing frustrated with their appointments being stolen.

156. Corey once again assured Plaintiff that he would investigate the issue.

157. Upon concluding his meeting with Corey, Plaintiff immediately called Priscilla Rivera to apprise her of the situation.

158. Priscilla informed Plaintiff that she had no knowledge regarding any investigation into the matter and that none of the other supervisors were responding to her inquiries.

159. On or around February 19, 2022, Plaintiff received a phone call from coworker, Vinny Hess (VP of the Water Department).

160. Vinny called on Defendant ANGELINI's direction to instruct Plaintiff on various specifications for contacting clients and setting appointments.

161. Plaintiff expressed his frustration with the instruction, as Plaintiff was already aware of everything discussed during the phone call.

162. Vinny suggested that Plaintiff speak to Defendant ANGELINI regarding his frustration.

163. Vinny further informed Plaintiff, "I told him that he has to get past what he thinks of you and be happy you do your job," referencing Defendant ANGELINI.

164. Plaintiff asked Vinny to clarify what he meant by the statement.

165. Vinny replied, "Sean loves what you do, it's just… Talk to Sean man."

166. On or around February 21, 2022, Plaintiff was approached by a coworker (Scooter), who informed him that Defendant ANGELINI had continued to make accusations of theft against Plaintiff.

167. Scooter further informed Plaintiff that he was directed by Defendant ANGELINI to access Plaintiff 's computer and search for evidence of the alleged theft without Plaintiff 's knowledge.

168. Scooter continued, stating that they found no evidence of any theft and informed Defendant ANGELINI of the same.

169. Despite this information, Defendant ANGELINI continued his investigation pursuant to the belief that Plaintiff was stealing.

170. At all times material, Defendant ANGELINI'S continued allegations against Plaintiff and investigation of the same, stemmed from a discriminatory animus towards African Americans.

171. On or around February 21, 2022, Plaintiff received a phone call from Priscilla Rivera who informed Plaintiff that Scooter had expressed concern following his conversations with Plaintiff.

172. Scooter was concerned that he had pushed Plaintiff "over the edge," by informing Plaintiff of Defendant ANGELINI'S actions and accusations against Plaintiff.

173. Plaintiff sent his resignation via email later that evening.

174. On around February 22, 2022, Defendant ANGELINI circulated Plaintiff 's resignation email and held a videoconference meeting to discuss the same.

175. Upon information and belief, coworker Pat Carr stated, in reference to Plaintiff 's resignation, "This is the second-best day for Orbit since Frank left."

176. Upon information and belief, Defendant ANGELINI responded by asking, "do you think he will try to sue?"

177. Plaintiff contacted Pat Carr via text message and asked why he would make such a comment.

178. Pat Carr responded to Plaintiff 's question stating, "Whoever is feeding you info is spinning it to make it upset you for some reason. Every time from the very moment frank left, that I said, "I don't believe James is stealing."

179. After the videoconference meeting, Plaintiff sent an email to Defendant ANGELINI asking to discuss the events that led to his resignation.

180. Defendant ANGELINI agreed to meet with Plaintiff but requested that cell phones be turned off.

181. Upon meeting, Plaintiff told Defendant ANGELINI that he was not treated fairly and that there was no basis for the accusations of theft.

182. Defendant ANGELINI replied, "Bud, I liked you. I did not have a problem with you being black."

183. Plaintiff explained that there were no alternative explanations for the treatment he endured.

184. Plaintiff provided Defendant ANGELINI with detailed notes describing the treatment over the course of a nine-month period.

185. Defendant ANGELINI took notes and told Plaintiff that he would reach out regarding the notes.

186. Presently, Plaintiff has received no communications from Defendant ANGELINI or any agent of Defendant regarding Plaintiff 's notes.

187. Defendants subjected Plaintiff to a hostile work environment by subjecting Plaintiff to unfounded accusations and harassment based upon his race and color.

188. Defendants wrongfully terminated Plaintiff because of his race and in retaliation for his opposition of Defendants' unlawful conduct.

189. As a result of Defendants' conduct, Plaintiff felt extremely humiliated, degraded, embarrassed, victimized and emotionally distressed.

190. As a result of Defendants' conduct, Plaintiff suffers from increased stress and anxiety.

191. As a result of the acts and conduct complained herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails.

192. Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

193. Plaintiff claims that Defendants discriminated against and terminated her because of his race and because he complained or opposed the unlawful conduct of Defendants related to his race.

194. Plaintiff claims constructive and/or actual discharge.

195. Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

196. Plaintiff claims alternatively (in the event Defendants claim so or that the Court determines) that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors.

197. Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

198. Defendants have established a pattern and practice of not only discrimination but also retaliation.

199. The above are just some examples of some of the unlawful discrimination and retaliation to which Defendants subjected Plaintiff.

200. As Defendants conduct had been malicious, willful, extreme, outrageous, and with full knowledge of the law, Plaintiff respectfully seeks all available damages including but not limited to emotional distress, loss wages, back pay, front pay, statutory damages, attorney's fees, costs, interest, and punitive damages from all Defendants jointly and severally.

## COUNT I

**Employment Discrimination in Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.*
**(***Plaintiff v. Orbit Energy and Power, LLC***)**

201. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

202. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 provides in relevant part: "It shall be unlawful employment practice for an employer (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

203. At all times material, Plaintiff's race/color was and is African American/Black.

204. At all times material, Defendant ANGELINI was and is a Caucasian male.

205. At all times material, Defendant ANGELINI had knowledge of Plaintiff's race, color, and national origin.

206. At all times material, Defendant ANGELINI held supervisory authority over Plaintiff with respect to his employment.

207. At all times material, Defendant ORBIT authorized ANGELINI, in his capacity as owner to take tangible employment action against Plaintiff as an employee of ORBIT.

208. As alleged herein, ANGELINI, in his capacity as Plaintiff's supervisor, intentionally discriminated against Plaintiff in the terms and conditions of his employment on the basis of Plaintiff's race and color.

209. At all times material, ANGELINI's discriminatory conduct was not welcomed by Plaintiff.

210. At all times material, ANGELINI's comments and conduct toward Plaintiff was intentionally based upon Plaintiff's race and color.

211. As alleged herein, ANGELINI made repeated baseless accusations of theft against Plaintiff.

212. At all times material, Plaintiff's race and color were the motivating and/or determinative factors in ANGELINI making his baseless accusations.

213. As alleged herein, ANGELINI's discriminatory and harassing actions towards Plaintiff because of Plaintiff's race and color are unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964.

214. ANGELINI's unlawful employment actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected rights.

215. Defendant ORBIT is vicariously liable for the unlawful employment actions by ANGELINI against Plaintiff in the course and scope of ANGELINI's employment with Defendant ORBIT.

216. As a result of ANGELINI's unlawful discrimination against Plaintiff in violation of Title VII, Plaintiff has suffered and continues to suffer emotional and financial harm.

## COUNT II

### Hostile Work Environment In Violation of
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*
### (*Plaintiff v. Orbit Energy and Power, LLC*)

217. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

218. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 provides in relevant part: "It shall be unlawful employment practice for an employer (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

219. Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the Plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the Plaintiff's employment. *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993).

220. ANGELINI, in his capacity as Plaintiff's supervisor, intentionally discriminated against Plaintiff in the terms and conditions of his employment on the basis of Plaintiff's race and color.

221. At all times material, ANGELINI's intentional, racially motivated discrimination was not welcomed by Plaintiff.

222. At all times material, the intentional, race-based discrimination by ANGELINI was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

223. At all times material, Plaintiff believed his work environment to be hostile or abusive as a result of ANGELINI's racially discriminatory conduct.

224. The unlawful hostile work environment created by ANGELINI culminated in Plaintiff's resignation and or constructive termination on February 22, 2022.

225. At all times material, Plaintiff's race and color were the motivating and/or determinative factors in ANGELINI's decisions to take tangible employment action against Plaintiff.

226. At all times material, Plaintiff's race, color, and national origin were the but-for cause of ANGELINI's decision to take tangible and other employment action against Plaintiff.

227. As alleged herein, ANGELINI's intentional, discrimination and harassment of Plaintiff is an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964.

228. ANGELINI's unlawful action towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

229. Defendant ORBIT is vicariously liable for the unlawful employment actions by ANGELINI against Plaintiff in the course and scope of ANGELINI's employment with Defendant.

230. As a result of ANGELINI's unlawful discrimination against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered and continues to suffer emotional and financial harm.

## COUNT III

### Unlawful Retaliation in Violation of
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*
### (*Plaintiff v. Orbit Energy and Power, LLC*)

231. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

232. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer "(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

233. As alleged herein, Plaintiff engaged in protected activity under Title VII including but not limited to expressing opposition to ANGELINI's repeated accusations of theft against Plaintiff during his employment with ORBIT.

234. At all times material, Plaintiff's prior protected activity was the determinative factor in ANGELINI's decision to constructively terminate Plaintiff's employment.

235. At all times material, Plaintiff's prior protected activity was the but-for cause of ANGELINI's decision to terminate Plaintiff's employment.

236. The temporal proximity between Plaintiff's protected activity and ANGELINI's decision to take materially adverse employment action against Plaintiff is unusually suggestive of a retaliatory motive and gives rise to an inference of causation.

237. ANGELINI's decision to terminate Plaintiff in retaliation for Plaintiff's opposition to ANGELINI's unlawful employment practices was intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

238. At all times material, ANGELINI's decision to terminate Plaintiff's employment in retaliation for Plaintiff opposition to ANGELINI's unlawful employment practices was intended to dissuade a reasonable employee in Plaintiff's position from opposing ANGELINI's unlawful employment practices.

239. ANGELINI's decision to terminate Plaintiff's employment in retaliation for Plaintiff's prior protected activity is an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964.

240. Defendant ORBIT is vicariously liable for the unlawful employment actions by ANGELINI against Plaintiff in the course and scope of ANGELINI's employment with Defendant.

241. As a result of ANGELINI's unlawful discrimination against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered and continues to suffer emotional and financial harm.

## COUNT IV
### Unlawful Race Discrimination
### in Violation of 42 U.S.C § 1981
### (*Plaintiff v. All Defendants*)

242. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

243. 42 U.S.C § 1981 provides, in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

244. Section 1981's prohibition against racial discrimination in the making and enforcement of contracts provides a cause of action to remedy race discrimination in the employment context.

245. At all times material, Plaintiff and Defendant ORBIT were in an employment relationship entitled to the protections of 42 U.S.C. § 1981.

246. At all times material, Plaintiff's race and color was and is African American/Black.

247. At all times material, ANGELINI was and is a Caucasian male.

248. At all times material, ANGELINI had knowledge of Plaintiff's race.

249. At all times material, ANGELINI held supervisory authority over Plaintiff with respect to Plaintiff's employment and was expressly authorized by Defendant ORBU to take tangible employment action against Plaintiff.

250. ANGELINI in his capacity as Plaintiff's supervisor, intentionally discriminated against Plaintiff in the terms and conditions of his employment on the basis of Plaintiff's race by constructively terminating Plaintiff's employment on February 22, 2022.

251. At all times material, ANGELINI's conduct towards Plaintiff was intentionally based upon Plaintiff's race

252. At all times material, ANGELINI's intentional, racially motivated discrimination was not welcomed by Plaintiff.

253. At all times material, the intentional, race-based discrimination by ANGELINI was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

254. At all times material, Plaintiff believed his work environment to be hostile or abusive as a result of ANGELINI's racially discriminatory conduct.

255. The hostile work environment created ANGELINI against Plaintiff culminated in ANGELINI taking tangible employment action against Plaintiff.

256. At all times material, Plaintiff's race was the determinative factor in ANGELINI decision to take tangible employment actions against Plaintiff.

257. At all times material, Plaintiff's race was the but-for cause of ANGELINI's decisions to take tangible and other employment actions against Plaintiff.

258. As alleged herein, MESSA's intentional, racially motivated discrimination and harassment of Plaintiff is an unlawful employment practice in violation of 42 U.S.C. § 1981.

259. ANGELINI's unlawful actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

260. ANGELINI is individually liable for unlawful racial discrimination against Plaintiff in violation of 42 U.S.C. § 1981.

261. Defendant ORBIT is vicariously liable for the unlawful employment actions by ANGELINI against Plaintiff in the course and scope of ANGELINI's employment with Defendant.

262. As a result of ANGELINI's unlawful discrimination against Plaintiff in violation of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer emotional and financial harm.


**COUNT V**

**Racially Hostile Work Environment
In Violation of 42 U.S.C. § 1981
(*Plaintiff v. All Defendants*)**

263. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

264. 42 U.S.C § 1981 provides, in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to

sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

265. Section 1981's prohibition against racial discrimination in the making and enforcement of contracts provides a cause of action to remedy race discrimination in the employment context.

266. The Third Circuit has recognized that § 1981 provides a cause of action for hostile work environment and the standards for a hostile work environment clam are identical under Title VII and § 1981. *See, e.g., Ocasio v. Leigh Valley Family Health Center,* 92 Fed. Appx 876, 879-80 (3d Cir. 2004) ("As amended by the 1991 Civil Rights Act, § 1981 now encompasses hostile work environment claims, and we apply the same standards as in a similar Title VII claim.").

267. At all times material, Plaintiff and Defendant ORBIT were in an employment relationship entitled to the protections of 42 U.S.C. § 1981.

268. At all times material, Plaintiff's race and color was and is African American/Black.

269. At all times material, ANGELINI was and is a Caucasian male.

270. At all times material, ANGELINI had knowledge of Plaintiff's race.

271. At all times material, ANGELINI held supervisory authority over Plaintiff with respect to Plaintiff's employment and was expressly authorized by Defendant ORBU to take tangible employment action against Plaintiff.

272. At all times material, ANGELINI's conduct towards Plaintiff was intentionally based on Plaintiff's race.

273. At all times material, ANGELINI's intentional, racially motivated discrimination was not welcomed by Plaintiff.

274. At all times material, the intentional, race-based discrimination by ANGELINI was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

275. At all times material, Plaintiff believed his work environment to be hostile or abusive as a result of ANGELINI's racially discriminatory conduct.

276. The unlawful hostile work environment created by ANGELINI culminated in Plaintiff's resignation and or constructive termination on February 22, 2022.

277. At all times material, Plaintiff's race and color were the motivating and/or determinative factors in ANGELINI's decisions to take tangible employment action against Plaintiff.

278. At all times material, Plaintiff's race, color, and national origin were the but-for cause of ANGELINI's decision to take tangible and other employment action against Plaintiff.

279. As alleged herein, ANGELINI's intentional, discrimination and harassment of Plaintiff is an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964.

280. ANGELINI's unlawful action towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

281. Defendant ORBIT is vicariously liable for the unlawful employment actions by ANGELINI against Plaintiff in the course and scope of ANGELINI's employment with Defendant.

282. As a result of ANGELINI's unlawful discrimination against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered and continues to suffer emotional and financial harm.

## COUNT VI

**Unlawful Retaliation**
**In Violation of 42 U.S.C. § 1981**
**(*Plaintiff v. All Defendants*)**

283. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

284. The United States Supreme Court has held that retaliation claims are cognizable under § 1981. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442 (2008).

285. As alleged herein, Plaintiff engaged in protected activity under § 1981 including but not limited to expressing opposition to ANGELINI's repeated accusations of theft against Plaintiff during his employment with ORBIT.

286. At all times material, Plaintiff acted under a reasonable, good faith belief that Plaintiff's right to be free from discrimination on the basis of race was violated.

287. Defendant ORBIT, by and through Defendant ANGELINI, had explicit knowledge of Plaintiff's protected activity at the time ANGELINI made the decision to constructively terminate Plaintiff's employment on February 22, 2022.

288. At all times material, Plaintiff's prior protected activity was the determinative factor in ANGELINI's decision to constructively terminate Plaintiff's employment.

289. At all times material, Plaintiff's prior protected activity was the but-for cause of ANGELINI's decision to terminate Plaintiff's employment.

290. The temporal proximity between Plaintiff's protected activity and ANGELINI's decision to take materially adverse employment action against Plaintiff is unusually suggestive of a retaliatory motive and gives rise to an inference of causation.

291. ANGELINI's decision to terminate Plaintiff in retaliation for Plaintiff's opposition to ANGELINI's unlawful employment practices was intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

292. At all times material, ANGELINI's decision to terminate Plaintiff's employment in retaliation for Plaintiff opposition to ANGELINI's unlawful employment practices was intended to dissuade a reasonable employee in Plaintiff's position from opposing ANGELINI's unlawful employment practices.

293. ANGELINI's decision to terminate Plaintiff's employment in retaliation for Plaintiff's prior protected activity is an unlawful employment practice in violation of 42 U.S.C. § 1981.

294. Defendant ORBIT is vicariously liable for the unlawful employment actions by ANGELINI against Plaintiff in the course and scope of ANGELINI's employment with Defendant.

295. As a result of ANGELINI's unlawful discrimination against Plaintiff in violation of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer emotional and financial harm.

### COUNT VII
**Employment Discrimination in Violation of the
New Jersey Law Against Discrimination (NJLAD), N.J.S.A. §§ 10:5-1, *et seq.*
(*Plaintiff v. Orbit Energy and Power, LLC*)**

296. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

297. The NJLAD prohibits employers from discriminating against a person in compensation or in the terms and conditions of employment based upon the person's race, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, sexual orientation, genetic information, gender, gender identity, disability, nationality, military status, or atypical hereditary cellular or blood trait. See N.J.S.A. §§ 10:5-12(a).

298. Under the NJLAD, the plaintiff must establish a *prima facie* case of discrimination by showing she (1) is, or is perceived to be, a member of a protected class; (2) is qualified for the position; and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. Peper v. Princeton University, 77 N.J. 55, 83 (1978); Williams v. Pemberton Twp. Public Schools, 323 N.J. Super., 490, 502 (App. Div. 1999). In regard to the second element, the plaintiff must merely prove that she "was actually performing the job prior to the termination." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 454 (2005).

299. A plaintiff is not required to prove that her protected category was the only motivation for the defendant's actions; rather, the plaintiff must only prove that her protected category played a role in the decision and that it made an actual difference in the defendant's decision. Bergen Commercial Bank v. Sisler, 157 N.J. 188, 207 (1999).

300. First, Plaintiff is a member of a protected class based upon his race and color in that he is African American/Black.

301. Second, Plaintiff was qualified for his position and prior to his constructive termination, Plaintiff's productivity was high, and he was performing well.

302. Third, as outlined above, Plaintiff experienced an adverse employment action in the form of a hostile work environment that culminated in his constructive discharge.

303. Finally, Plaintiff's circumstances five rise to an inference of discrimination as he was subjected to baseless accusations of theft and held to higher performance standard than his white counterparts by Defendant ANGELINI. Additionally, when Plaintiff opposed Defendant ANGELINI's harassment, the hostile work environment not only continued but was also intensified.

304. Defendant ORBIT is vicariously liable for the unlawful employment actions by ANGELINI against Plaintiff in the course and scope of ANGELINI's employment with Defendant.

305. As a result of ANGELINI's unlawful discrimination against Plaintiff in violation of the NJLAD, Plaintiff has suffered and continues to suffer emotional and financial harm.


## COUNT VIII

**Hostile Work Environment in Violation of the
New Jersey Law Against Discrimination (NJLAD), N.J.S.A. §§ 10:5-1, *et seq.*
(*Plaintiff v. Orbit Energy and Power, LLC*)**

306. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

307. The NJLAD also prohibits hostile work environment harassment, which is harassing conduct in the workplace that would not have occurred but for one of the above-mentioned protected characteristics of the employee (e.g., gender/sex) that is severe or pervasive enough to make a reasonable person with that protected characteristic (e.g., a reasonable person of the involved gender/sex) believe the conditions of the workplace are altered and the working environment is hostile or abusive. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993).

308. An employer is strictly liable for unlawful harassment committed by an employee's supervisor where the harassment culminates in a tangible employment action. Lehman, 132 N.J. at 593.

309. Here, Defendants' conduct (1) occurred because of Plaintiff's legally protected characteristic; and (2) was severe or pervasive enough to make a reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile or abusive.

310. First, the harassing conduct here would not have occurred but for Plaintiff's status as an African American individual.

311. Second, Defendant ORBIT delegated to Defendant ANGELINI the authority to control Plaintiff's working environment. A reasonable person in Plaintiff's position would have found Defendants' conduct severe and pervasive such that the terms and conditions of employment and render the working environment intimidating, hostile or abusive. Defendants' conduct culminated in Plaintiff experiencing an actual adverse employment action (constructive discharge).

312. Defendant ORBIT is vicariously liable for the unlawful employment actions by ANGELINI against Plaintiff in the course and scope of ANGELINI's employment with Defendant.

313. As a result of ANGELINI's unlawful discrimination against Plaintiff in violation of the NJLAD, Plaintiff has suffered and continues to suffer emotional and financial harm.

**<u>COUNT VIII</u>**

**Retaliation in Violation of the
New Jersey Law Against Discrimination (NJLAD), N.J.S.A. §§ 10:5-1,** *et seq.*
**(***Plaintiff v. Orbit Energy and Power, LLC***)**

314. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

315. The NJLAD prohibits employers from retaliating against employees for engaging in "protected activity," such as complaining about, or protesting against, discrimination in the workplace. N.J.S.A. § 10:5-12(d).

316. The term retaliation can include, but is not limited to, being discharged, demoted, not hired, not promoted or disciplined. In addition, many separate, but relatively minor, instances of behavior directed against the plaintiff may combine to make up a pattern of retaliatory

behavior. Nardello v. Twp. of Voorhees, 377 N.J. Super. 428, 433-436 (App. Div. 2005); *Green v. Jersey City Bd. of Educ.*, 177 N.J. 434, 448 (2003).

317. The plaintiff is not required to prove that her protected activity was the only motivation for the defendant's actions; rather, the plaintiff must only prove that his protected activity played a role in the decision and that it made an actual difference in the defendant's decision. *Donofry v. Autotote Systems, Inc.*, 350 N.J. Super. 276, 295 (App. Div. 2001) ("Plaintiff need not prove that his whistle-blowing activity was the only factor in the decision to fire him."); Kolb v. Burns, 320 N.J. Super. 467, 479 (App. Div. 1999) (burden on plaintiff is to show "retaliatory discrimination was more likely than not a determinative factor in the decision").

318. As alleged herein, Plaintiff engaged in protected activity under the NJLAD including but not limited to expressing opposition to ANGELINI's repeated accusations of theft against Plaintiff during his employment with ORBIT.

319. At all times material, Plaintiff acted under a reasonable, good faith belief that Plaintiff's right to be free from discrimination on the basis of race was violated.

320. Defendant ORBIT, by and through Defendant ANGELINI, had explicit knowledge of Plaintiff's protected activity at the time ANGELINI made the decision to constructively terminate Plaintiff's employment on February 22, 2022.

321. At all times material, Plaintiff's prior protected activity was the determinative factor in ANGELINI's decision to constructively terminate Plaintiff's employment.

322. At all times material, Plaintiff's prior protected activity was the but-for cause of ANGELINI's decision to terminate Plaintiff's employment.

323. The temporal proximity between Plaintiff's protected activity and *ANGELINI*'s decision to take materially adverse employment action against Plaintiff is unusually suggestive of a retaliatory motive and gives rise to an inference of causation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the named Defendants, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Date: <u>December 15, 2022</u>